# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 08-2724

UNITED ELECTRICAL, RADIO AND
MACHINE WORKERS OF AMERICA (UE),

*Petitioner*,

*v.*

NATIONAL LABOR RELATIONS BOARD,

*Respondent*,

and

ALUMINUM CASTING & ENGINEERING
COMPANY, INCORPORATED,

*Intervening Respondent*.

Petition for Review of an Order of the
National Labor Relations Board.
Nos. 30-CA-12855, 30-CA-12902, 30-CA-12943,
30-CA-12944 and 30-CA-12949

ARGUED JANUARY 15, 2009—DECIDED SEPTEMBER 2, 2009

Before RIPPLE, MANION and EVANS, *Circuit Judges*.

RIPPLE, *Circuit Judge*. This case has been here once before. In our earlier decision, we enforced an order of the

National Labor Relations Board ("the Board"), which had found that Aluminum Casting & Engineering Company, Inc. ("ACE/CO" or "the Company") violated the National Labor Relations Act ("NLRA") when, in 1995, it deviated from its established practice of awarding annual, across-the-board wage increases to all employees because of their attempts to unionize. *See NLRB v. Aluminum Casting & Eng'g Co., Inc.*, 230 F.3d 286, 293 (7th Cir. 2000) (*UEW I*). In *UEW I*, we enforced the Board's order requiring ACE/CO to "[m]ake whole all employees who were not granted annual wage increases in 1995 to date." *Id.* at 295 (emphasis omitted). We noted, however, that ACE/CO should be given the opportunity to prove that it would not have awarded an across-the-board wage increase in 1996 and the following years. *Id.* at 296-97.

After a substantial-compliance investigation, the Administrative Law Judge ("ALJ") determined that a twenty-five-cent-per-hour wage increase had been withheld unlawfully from the employees in 1995. The ALJ further determined that ACE/CO's liability for this across-the-board wage increase was limited to 1995, and, consequently, ACE/CO was not required to build this additional twenty-five cents per hour into its employees' wages for 1996 and the following years. A majority of a three-member panel of the Board agreed.[1] It reasoned that carrying forward the 1995 wage increase into 1996

---

[1] *See Aluminum Casting & Eng'g Co., Inc. & United Elec., Radio & Mach. Workers of Am.*, 349 NLRB No. 18, slip op. at 2 (Jan. 31, 2007) (*Second Supplemental Decision and Order*).

and the following years would result in a windfall for the employees and would be inconsistent with the remedial purposes of the National Labor Relations Act, 49 Stat. 449, as amended, 29 U.S.C. § 151 et seq. *Second Supplemental Decision and Order*, 349 NLRB No. 18, slip op. at 2. ACE/CO therefore was ordered only to award back pay to 381 employees for the hours they worked in 1995.[2] The Board did not, however, require ACE/CO to build this wage increase into each employee's base wage.

In this petition for review, United Electrical, Radio & Machine Workers of America ("UEW") maintains that the Board's 1995 back pay award should have been incorporated into the employees' "base wage" for that year, so that all subsequent pay raises would be added to a base wage that included this 1995 pay increase. In short, they submit that, beginning in 1996, the employees' "base wage" should have been equal to the wage rate they actually received in 1995 plus an additional twenty-five cents per hour; any additional wage increases they received in 1996 and beyond should have been added to that adjusted "base wage." For the reasons set forth in this opinion, we believe that the UEW is correct. Accordingly, we grant the petition for review, set aside the decision of the Board and remand this case for further proceedings consistent with this opinion.

---

[2] *See Aluminum Casting & Eng'g Co., Inc. & United Elec., Radio & Mach. Workers of Am.*, 325 NLRB No. 1, slip op. at 1-2 (Jan. 18, 2008) (*Third Supplemental Decision and Order*).

# I

## BACKGROUND

A detailed discussion of the factual background of this case may be found in our prior opinion, *UEW I*, 230 F.3d at 288-93. For the convenience of the reader, we shall repeat here the key details of ACE/CO's compensation practices that are necessary for an understanding of this phase of the litigation.

In 1989, ACE/CO announced that its hourly employees would receive a ten-cent-per-hour wage increase, effective February 13, 1989, and would later receive an additional five-cent-per-hour wage increase, effective August 14, 1989. These wage increases, which were based on rises in the cost of living in the Milwaukee area, the Company's performance and the wages offered by comparable companies, became a permanent addition to the employees' wages. Consequently, these wage increases were added to the employees' existing wage rates and resulted in a new "base wage." Raises in subsequent years were added to this base wage.

In 1990, across-the-board wage increases again were implemented. These increases, like the 1989 increases, became a permanent addition to the employees' wages. Although no wage increase was given in 1991, the pattern of awarding across-the-board wage increases continued in 1992, 1993 and 1994; each of these across-the-board wage increases became a permanent part of the employees' wages, resulting in a new base wage.

No wage increase was awarded in 1995. ACE/CO claimed that, in that year, it had abandoned across-the-board

wage increases in favor of a new, merit- and training-based compensation system. The Board found, however, that, at least in 1995, ACE/CO's merit- and training-based wage increases were ancillary to, and not substitutes for, the across-the-board wage increases. The Board also determined that ACE/CO's failure to award across-the-board wage increases in 1995 was in retaliation for the employees' organizational activities and that ACE/CO therefore had violated sections 8(a)(1) and 8(a)(3) of the NLRA. *Id.* at 292-93. We sustained these determinations. *See id.* at 291-93.

After a subsequent substantial-compliance proceeding, the Board determined that, in 1996, ACE/CO had abandoned the use of across-the-board wage increases and had adopted a program that awarded wage increases based on merit and the completion of training programs. Therefore, reasoned the Board, the Company was not obligated to award additional across-the-board wage increases in 1996 or in subsequent years. Moreover, ruled the majority of the Board panel, the new merit- and training-based wage increases that were added in 1996 and the following years should be added to the employees' *actual* 1995 wage rates, which were not adjusted to include the twenty-five-cent-per-hour wage increase wrongfully denied to the workers in that year. The dissenting member of the Board took the view that, although the Company was permitted to change prospectively the manner in which it awarded wage increases after 1995, it must build those later increases on the adjusted base wage of the worker as of the *end* of 1995, a methodology that would incorporate the wrongfully denied wage increase into the employees' wages.

## II

## DISCUSSION

In reviewing the Board's order, we must respect its "broad discretion to devise [a] remed[y] that effectuate[s] the policies of the [NLRA]." *NLRB v. Intersweet, Inc.*, 125 F.3d 1064, 1067 (7th Cir. 1997) (citation and quotation marks omitted); *see* 29 U.S.C. § 160(c) (permitting the Board, upon finding that a party has engaged in an unfair labor practice, "to take such affirmative action including reinstatement of employees with or without back pay, as will effectuate the policies of [the NLRA]"). The Board's exercise of this discretion "is subject to only limited judicial review." *NLRB v. Midw. Pers. Servs., Inc.*, 508 F.3d 418, 422-23 (7th Cir. 2007). Therefore, we shall "enforce the Board's order if its factual findings are supported by substantial evidence in the record as a whole and its legal conclusions have a reasonable basis in law." *NLRB v. Midw. Pers. Servs., Inc.*, 322 F.3d 969, 976 (7th Cir. 2003) (citing 29 U.S.C. § 160(e) and *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951)).

## A.

Given this standard of review, we must begin our analysis with a careful, respectful study of the Board's opinion and the position that it takes in the brief that it has filed before us. In the Board's view, the Company must award compensatory back pay for its violation of the Act only for the hours actually worked by its employees in 1995. The evidence shows, the Board continues,

that the Company switched from a policy of across-the-board increases to a policy of merit- and training-based increases in 1996. Therefore, it reasons, the 1995 wage increase need not be included in the base wage to which the 1996 merit increases are added. It relies heavily on our statement in *UEW I* that ACE/CO should be permitted to demonstrate that "it had abjured across-the-board raises . . . [which would] suffice to excuse ACE/CO from making any adjustments for 1996, [and] it would also establish this new baseline for future years as well." *UEW I*, 230 F.3d at 296.

In reaching this conclusion, the Board undertook a detailed factual analysis and determined that ACE/CO lawfully had created a new compensation system in 1996. It assumed that, in 1996, the Company allocated all of the funds available for wage increases to merit- and training-based wage increases under the new compensation system. In the Board's view, the decision to award only merit-based increases constituted a new compensation system that "was not based on a 'baseline' for bargaining unit labor costs that incorporated a 25-cent increase in 1995." *Second Supplemental Decision and Order*, 349 NLRB No. 18, slip op. at 2. In essence, the Board assumed that the 1996 compensation system would have been altered if the Company had made across-the-board increases in 1995. To support this view, the Board reasoned that, if ACE/CO had issued an across-the-board wage increase in 1995, it necessarily would have had less money available for merit- and training-based wage increases in 1996, and the amounts of those new wage increases necessarily would have

been decreased as a result. *See* Respondent's Br. 22. After the 1996 merit increases, therefore, each employee had been restored, as closely as possible, to the economic position in which he would have been absent ACE/CO's misconduct.

UEW, agreeing with the dissenting Board member, submits that the Board misconstrued our language in *UEW I* and also failed to resolve any ambiguities against the wrongdoer, ACE/CO. According to UEW, our statement in the underlying case—"if . . . ACE/CO introduced evidence that it had abjured across-the-board raises forever . . . not only would that suffice to excuse ACE/CO from making any adjustments for 1996, but it would establish this new baseline for future years as well"—was intended to relieve ACE/CO from making *additional* across-the-board wage increases in 1996 and the following years, if the Board determined that the Company had, in fact, abandoned that compensation structure. It did not, however, excuse ACE/CO from the obligation of permanently incorporating the 1995 across-the-board wage increase into its employees' base wages and adding any increases in 1996 and the following years, however determined, to that base. To support this view, UEW notes that, based on ACE/CO's past practice, it is clear that any across-the-board increase awarded in 1995 would have been permanently incorporated into the employees' wages in subsequent years. Furthermore, UEW submits, to the extent that there is any ambiguity as to whether the back pay award should be permanently incorporated into the employees' wages, that ambiguity is attributable solely to ACE/CO's

unlawful conduct and not the implementation of a new compensation program.[3] Thus, it concludes, the Board should have resolved any ambiguities in favor of the employees and permanently incorporated the twenty-five-cent increase into the employees' wage rates. *See Campbell Elec. Co.*, 340 NLRB 825, 826 (NLRB 2003) (noting that remedies should restore employees to the position they would have obtained absent the unfair labor practice, and indicating that "any . . . ambiguity regarding the status that would have [been] obtained without the unlawful conduct must be resolved against the . . . wrongdoer").

**B.**

Central to the Board's determination was its reading of a passage of our opinion. The Board focused on our statement that, if ACE/CO could show that it had abandoned across-the-board increases, it would be excused from "making any adjustments for 1996, [and] it would also establish this new baseline for future years as well." *UEW I*, 230 F.3d at 296. The Board read this statement to mean that, if ACE/CO could demonstrate that it had abandoned the use of across-the-board increases in 1996,

---

[3] UEW disputes ACE/CO's claim that a new compensation system was implemented in 1996. It claims that ACE/CO did not implement a new system, but, rather, expanded its existing training- and merit-based compensation programs and eliminated one component of its compensation system, the across-the-board wage increase.

it could add any wage increases in 1996 and the fol-lowing years to a 1995 baseline that reflected what actually was paid to the employees, *exclusive* of the wrongfully withheld twenty-five-cent-per-hour wage increase. *Second Supplemental Decision and Order*, 349 NLRB No. 18, slip op. at 3.

We cannot accept the Board's reading of our earlier opinion. In *UEW I,* we addressed the Company's claim that the Board's original order was so broad that the Company would be obliged to award across-the-board annual wage increases in 1995 and in each of the following years. In reply to that argument, we simply held that, *once the workers were made whole for the violation of the Act in 1995,* the Board's original order should not be construed as requiring the Company to continue to grant *additional* across-the-board increases in subse-quent years if, in any of those years, it had decided to institute another, lawful wage-increase system. In short, it was our understanding that the Board's order required the Company to make the employees whole for the violation that had occurred. Once the company had done so, it was free to implement any wage-increase system that it chose, so long as that new wage system complied with the Act. Our point was that the Board did not have before it the question of any wage increases *for the years following 1995*. The Board's order "expressly did not bind ACE/CO to a perpetual practice of granting [across-the-board wage increases]." *Id.* at 296. Therefore, we determined, if ACE/CO could demonstrate "that general wage increases are *passé* and it has found a better way to maintain competitive wage levels . . . [the]

order does no more than require payment of the 1995 increase." *Id.*

This interpretation of our prior opinion is logical, given the limited issue under discussion in *UEW I:* whether the Board's order impermissibly required ACE/CO to award across-the-board increases for 1996 and each of the following years. *Id.* at 295-96. Just as importantly, it is the only interpretation that is compatible with the law governing remedial measures under the Act. The Board must make workers "whole for losses suffered on account of an unfair labor practice" under the Act. *Phelps Dodge Corp. v. NLRB*, 313 U.S. 177, 197 (1941). More specifically, in awarding back pay, the Board must attempt to "recreate the . . . relationships that would have been had there been no unfair labor practice." *Franks v. Bowman Transp. Co., Inc.*, 424 U.S. 747, 769 (1976) (citation and quotation marks omitted).

The Board contends that, in instituting the 1996 merit increase policy, ACE/CO in effect addressed, albeit indirectly, its remedial obligations because it "lawfully allocated the money *actually* available to it for wage increases solely to merit and training raises, without consideration of an across-the-board increase." Respondent's Br. 22. The Board assumes that ACE/CO had only a limited pool of funds available for wage increases in 1996, and that, had ACE/CO implemented an across-the-board increase in 1995, the size of that pool—and the size of the 1996 wage increases—would have decreased by an amount equal to the amount of funds allocated in the 1995 across-the-board increase. Therefore, the Board

concludes, ACE/CO's employees received the same wage rate in 1996 as they would have received if ACE/CO had awarded both the 1995 across-the-board wage increase and the reduced 1996 wage increases. Accordingly, the Board maintains that its remedy is appropriately tailored to fulfilling its remedial obligation for the 1995 violation.

We cannot accept this argument. At the outset, the record simply does not support the Board's conclusion that, had the Company not violated the Act in 1995 and instead paid the expected across-the-board wage increase in that year, the pool of funds available for the 1996 merit- and training-based program necessarily would have been reduced by the amount paid out as a result of the 1995 across-the-board increase. The record is indeed vague on the total amount of funds available for distribution in 1996, the total amount of raises actually awarded in 1996, and ACE/CO's methodology for awarding the wage increases offered in that year. In fact, when a compliance officer requested that ACE/CO provide documentation relating to its decision to abandon the across-the-board compensation system in favor of an alternative reward system, ACE/CO was unable to provide any minutes or documents reflecting the reasoning behind its decision. *See* G.C. Ex.12 at 1, 2 (statement of Compliance Officer Gifford).

More importantly, even if the pool of funds available for the 1996 merit-based increases had included the amount of money that otherwise would have been distributed had the Company awarded an across-the-board

wage increase in 1995, it is not clear that those funds would have been distributed in a manner that would have placed each wronged worker in the position he would have been in had the 1995 wage increase been awarded. The Board points to no evidence that the Company's 1996 wage increases took this consideration into account. Indeed, the parties seem to agree that, when it implemented the 1996 wage increases, the Company simply ascertained the 1995 base wage of the employee, *excluding the wrongfully withheld increase*, and added to that amount whatever merit-based wage increase it deemed appropriate under its new method.

In the same vein, the Board also submits that, if the wronged workers had received the twenty-five-cent-per-hour wage increase wrongfully withheld in 1995, they well might not have received the merit increases that were distributed in 1996. This argument is speculative, and, contrary to the Board's suggestion, the wronged workers should not have to bear the burden of any ambiguity in this respect. After all, the ambiguity is the result of the Company's illegal withholding of the 1995 increase. Therefore the Company, not the individual worker, must bear any loss from the lack of available evidence. Because it violated the law, the Company did not compute correctly the 1995 base wage of each worker; because it violated the law, the Company is not in a position to show whether the pool of funds available for the 1996 merit increases included all of the money that it would have distributed in 1995 had it acted legally; because it violated the law, the Company is unable to show whether, in 1996 and subsequent years, every wronged

employee received a wage increase equal to the raise wrongfully denied him in 1995 *and* the amount that would have been awarded him under the merit- and training-based program. The Company, not the workers, must bear any loss for the Company's illegal activity.

### Conclusion

The Board's interpretation of our earlier opinion is erroneous. Its factual conclusions are unsupported by the evidence in the record. Therefore, because the Board's remedial order is based on an error of law and an unsubstantiated finding of fact, we must grant UEW's petition for review and set aside the Board's order. Accordingly, we grant the petition for review, set aside the Board's order and remand the case to the Board for proceedings consistent with this opinion.

PETITION GRANTED;
ORDER SET ASIDE; CASE REMANDED