# IN THE SUPREME COURT OF IOWA

No. 18–0505

Filed May 17, 2019

**UNITED ELECTRICAL, RADIO & MACHINE WORKERS OF AMERICA,**

Appellant,

vs.

**IOWA PUBLIC EMPLOYENT RELATIONS BOARD,**

Appellee,

and

**STATE OF IOWA** and **BOARD OF REGENTS,**

Intervenors-Appellees.

---

Appeal from the Iowa District Court for Polk County, Douglas F. Staskal, Judge.

A union appeals a district court order dismissing its petition for judicial review of a declaratory order of the Iowa Public Employment Relations Board. **AFFIRMED.**

Charles Gribble and Christopher Stewart of Parrish Kruidenier Dunn Boles Gribble Gentry Brown & Bergmann, L.L.P., Des Moines, for appellant.

Diana S. Machir, Des Moines, for appellee Iowa Public Employment Relations Board.

Thomas J. Miller, Attorney General, and Molly M. Weber, Assistant Attorney General, for intervenors-appellees State of Iowa and Iowa Board of Regents.

Christy A.A. Hickman, Des Moines, for amicus curiae Iowa State Education Association.

**MANSFIELD, Justice.**

### I. Introduction.

This case requires us to interpret recent amendments to the Public Employment Relations Act limiting the mandatory subjects of collective bargaining and the matters an arbitrator may consider if the dispute enters binding arbitration. Under the 2017 amendments, when a bargaining unit does not have at least thirty percent public safety employees, bargaining is limited to "base wages and other matters mutually agreed upon." 2017 Iowa Acts ch. 2, § 6 (codified at Iowa Code § 20.9(1) (2018)). If such bargaining reaches impasse and the impasse persists, the dispute goes to binding arbitration, but the arbitrator may not consider "[p]ast collective bargaining agreements between the parties." *Id.* § 13 (codified at Iowa Code § 20.22(8)(*b*)(1)).

Seeking to clarify the meaning of these provisions, a union sought a declaratory order from the Iowa Public Employment Relations Board (PERB) and then judicial review of the declaratory order. Both PERB and the district court ruled that "base wages" meant the "minimum (bottom) pay for a job classification, category or title, exclusive of additional pay such as bonuses, premium pay, merit pay, performance pay or longevity pay." In addition, both ruled that "past collective bargaining agreements" meant agreements that predate the current expiring agreement. The union appealed.

On appeal, we now hold that PERB and the district court correctly interpreted the 2017 amendments. In the abstract, terms like "base wages" and "past collective bargaining agreements" are ambiguous, but the context allows us to determine their meaning here. We conclude that "base wages" means the floor level of pay for each job before upward adjustments such as for job shift or longevity. The term "past collective

bargaining agreements," in the context of a law that limits the arbitrator's potential award to a certain percentage increase in base wages, Iowa Code § 20.22(10)(*b*)(1) (2018), allows the arbitrator to consider the existing collective bargaining agreement but not ones that came before. *See id.* § 20.22(8)(*b*)(1). Accordingly, we affirm the judgment of the district court.

## II. Background Facts and Proceedings.

The United Electrical, Radio & Machine Workers of America (UE) is the parent of two local unions based in Iowa: UE Local 893/Iowa United Professionals and UE Local 896 (COGS). Both locals are certified by PERB to represent bargaining units of State of Iowa public employees. Local 896 represents a unit of graduate and professional students employed by the University of Iowa. Local 893 represents the science and social services units of state employees.

The Iowa legislature enacted House File 291 in February 2017 to amend the Public Employment Relations Act. *See* 2017 Iowa Acts ch. 2 (codified in part at Iowa Code ch. 20 (2018)). Previous law required public employers and certified bargaining representatives

> to negotiate in good faith with respect to wages, hours, vacations, insurance, holidays, leaves of absence, shift differentials, overtime compensation, supplemental pay, seniority, transfer procedures, job classifications, health and safety matters, evaluation procedures, procedures for staff reduction, in-service training and other matters mutually agreed upon.

Iowa Code § 20.9 (2017). The 2017 amendments altered this duty for bargaining units that had less than thirty percent public safety employees to "*base wages* and other matters mutually agreed upon." 2017 Iowa Acts ch. 2, § 6 (codified at Iowa Code § 20.9 (2018)) (emphasis added). Thus, for many public employees in Iowa, the only mandatory subject of

collective bargaining became "base wages." The amendments did not define base wages.

In addition, if a collective bargaining negotiation stalled and binding arbitration was required, previous law required the arbitrator to consider "[p]ast collective bargaining contracts between the parties including the bargaining that led up to such contracts." Iowa Code § 20.22(7)(*a*) (2017). In 2017, this was changed for bargaining units containing less than thirty percent public safety employees. Henceforth, the arbitrator would be prohibited from considering "[p]ast collective bargaining agreements between the parties or bargaining that led to such agreements." 2017 Iowa Acts ch. 2, § 13 (codified at Iowa Code § 20.22(8)(*b*)(1) (2018)). At the same time, the 2017 amendments required the arbitrator to "consider and specifically address in the arbitrator's determination . . . [c]omparison of base wages, hours, and conditions of employment of the involved public employees with those of other public employees doing comparable work . . . ." *Id.* (codified at Iowa Code § 20.22(8)(*a*)(1)). Additionally, the following qualification was added for bargaining units containing less than thirty percent public safety employees:

> [T]he arbitrator's award shall not exceed the lesser of the following percentages in any one-year period in the duration of the bargaining agreement:
>
> (a) Three percent.
>
> (b) A percentage equal to the increase in the consumer price index for all urban consumers for the midwest region, if any, as determined by the United States department of labor, bureau of labor statistics, or a successor index. Such percentage shall be the change in the consumer price index for the twelve-month period beginning eighteen months prior to the month in which the impasse item regarding base wages was submitted to the arbitrator and ending six months prior to the month in which the impasse item regarding base wages was submitted to the arbitrator.

*Id.* § 12 (codified at Iowa Code § 20.22(10)(*b*)(1)(a)–(b)).

On April 21, approximately two months after House File 291 became law, UE petitioned for a declaratory order from PERB. UE sought a declaration on whether four proposals constituted mandatory, permissive, or prohibited subjects of bargaining. UE also asked a fifth question concerning the authority of an arbitrator to consider wage levels under the existing, expiring collective bargaining agreement.

### Proposal I

"Employee Organization is proposing an annual base wage of 1. $50,000.00 for each employee,

    A. per year beginning July 1, 2018 through June 30, 2019,

    B. distributed in bi-monthly payments on the 1st and 15th of each month,

    C. for working 8 hours a day, 40 hours per week,

    D. with nine (9) holidays,

    E. three (3) weeks' paid vacation,

    F. ten (10) days paid sick leave,

    G. time and a half for hours worked over 40 hours in a single week."

PERB is asked to state whether item 1 is of Proposal I mandatory, permissive or prohibited subject of bargaining and to provide a ruling as to whether item 1A is a mandatory, permissive or prohibited subject of bargaining. The same request for a ruling as to 1B and to each part thereafter with rationale for the proposed decision.[1]

### Proposal II

The employee organization has proposed an annual base wage for each employee in the bargaining unit as follows:

Employee A: $32,000.00
Employee B: $34,000.00
Employee C: $36,802.41

---

[1]The paragraph numbers of the petition have been removed.

Employee D: $40,121.00
Employee E: $43,650.00
Employee F: $45,444.00
Employee G: $48,602.00
Employee H: $54.604.50
Employee I: $61,889.42
Employee J: $69,551.41

PERB is asked to state whether Proposal II is a mandatory, permissive or prohibited subject of bargaining.

## **Proposal III**

The employee organization represents employees in four different pay grades with pay grades one requiring the least amount of time on the job and pay grade four the most. Each increased step reflects one more year of service (there are no seniority rights) and annual base wage is as follows:

Pay Grade 1:[2]
Year 1 - $30,000
Year 2 - $32,000
Year 3 - $35,000
Year 4 - $40,000
Year 5 - $46,000

Pay Grade 2:
Year 1 - $35,000
Year 2 - $38,000
Year 3 - $41,000
Year 4 - $45,000
Year 5 - $50,000

Pay Grade 3:
Year 1 - $40,000
Year 2 - $44,000
Year 3 - $48,000
Year 4 - $52,000
Year 5 - $56,000

Pay Grade 4:
Year 1 - $45,000
Year 2 - $49,000
Year 3 - $54,000
Year 4 - $60,000
Year 5 - $66,000

PERB is asked to state whether Proposal III is a mandatory, permissive or prohibited subject of bargaining.

---

[2]UE later clarified that each "pay grade" refers to a separate job classification.

## **Proposal IV**

The employee organization represents a group of employees working on a 11:00 p.m. to 7:00 a.m. work schedule established by the employer, for which it proposes an annual base wage of $55,000.00 with a one-hour lunch break and two fifteen minute breaks.

PERB is asked to state whether Proposal IV is a mandatory, permissive or prohibited subject of bargaining.

## **Proposal V**

The employee organization, representing employees in non-safety bargaining unit and the public employer, have negotiated on the subject of "base wages" and have been unable to reach an agreement. The employee organization therefore has requested arbitration. The contract ending June 30, 2018 provides for an annual base wage for all employees of $45,000.00. The employer[']s final offer at arbitration is an annual base wage of $35,000.00 for all the employees in the bargaining unit. The employee organization's final offer for arbitration is an annual base wage of $55,000.00 for all employees in the bargaining unit. The public employer states that the arbitrator cannot consider the employee organizations award since it is greater than the increase in the consumer price index and in any event is greater than 3%. The employee organization states that the arbitrator can neither consider or even be informed of base wages paid to employees under the expiring contract in that the law as amended provides:

> "The arbitrator shall not consider the following factors:
>
> > (1) Past collective bargaining agreements between the parties or bargaining that led to such agreements."

Thus, the employee organization states that neither side can rely on a collective agreement whose terms have expired. Thus, just as the employer is free to ignore the prior agreement and offer a wage substantially less than the employees were receiving, the employee organization is free to propose a substantially greater base wage. To hold otherwise would require the arbitrator to look at the wages paid in the past collective bargaining agreement which the arbitrator specifically is precluded from doing. To hold otherwise would mean that the terms of a contract that had expired in June of 2018 absent voluntary agreement limit the wages that an arbitrator could award and an employee could receive in perpetuity. In other words, the ending base wage rate in the

June 30, 2018 contract would be the starting point for the consideration of every wage rate thereafter be it twenty-five or fifty years in the future.

The question posed is may the arbitrator look to the past collective bargaining agreement, the one expiring June 30, 2018 and consider the wage paid in past collective bargaining as consideration for an award on base wages.

On June 29, PERB issued a declaratory order. It determined that subparagraphs C, D, E, F, and G of Proposal I involved permissive subjects of bargaining, i.e., hours, holidays, vacations, leaves of absence, and overtime pay rates. PERB added, however, that the employer has a good faith duty to disclose its position on "quantity-of-work-related permissive topics" so that the employee organization can "knowledgeably and rationally bargain employee base wages." PERB declined to answer Proposal II without information on whether each employee occupied a different job classification. As to Proposal III, PERB indicated that only the floor level of compensation (Year 1) was a mandatory subject of bargaining; longevity pay would be a permissive subject of bargaining. Concerning Proposal IV, PERB stated that any "shift differential" (assuming the proposal was for higher pay for those working 11 p.m. to 7 a.m. within the same job classification) would also be a permissive subject of bargaining. Lastly, regarding Proposal V, PERB stated that to harmonize and give effect to all of the amendments to Iowa Code section 20.22, "past collective bargaining agreements" must mean agreements other than the current expiring agreement.

On September 19, UE filed a petition in the Polk County District Court seeking judicial review of PERB's declaratory order (except as to Proposal II). The State of Iowa and the Iowa Board of Regents moved to intervene, and their motions were granted. On March 15, 2018, the district court entered an order affirming the PERB's decision and denying

and dismissing UE's petition for judicial review. UE appealed, and we retained the appeal.

### III.  Standard of Review.

Preliminarily, we must determine whether we should give deference to PERB's interpretations of Iowa Code chapter 20. Under chapter 17A, deference to an agency's legal interpretations is warranted when such authority is "clearly . . . vested by a provision of law in the discretion of the agency." *Waterloo Educ. Ass'n v. Iowa Pub. Emp't Relations Bd.*, 740 N.W.2d 418, 419 (Iowa 2007) (quoting Iowa Code § 17A.19(10)(*c*), (*l*) (2005)), *abrogated in part by statute*, 2010 Iowa Acts ch. 1165, § 6 (codified at Iowa Code § 20.6(1) (2011)). When a provision of law vests interpretive discretion in an agency, the court may reverse only if the agency's interpretation was "irrational, illogical, or wholly unjustifiable." *Id.* at 419–20 (quoting *Birchansky Real Estate, L.C. v. Iowa Dep't of Pub. Health*, 737 N.W.2d 134, 138 (Iowa 2007)); *see also* Iowa Code § 17A.19(10)(*l*).

In *AFSCME Iowa Council 61 v. Iowa Public Employment Relations Board*, we discussed the effect of legislative amendments in 2010 to section 20.6 that replaced statutory language authorizing PERB only to "[a]dminister" the provisions of chapter 20 with language expressly authorizing it to "[i]nterpret, apply, and administer" the provisions of the chapter. 846 N.W.2d 873, 878 (Iowa 2014) (quoting 2010 Iowa Acts ch. 1165, § 6 (codified at Iowa Code § 20.6(1) (2011))). We found, "Because the legislature has now expressly vested PERB with discretion to interpret and apply chapter 20, we will review PERB's interpretation and application of section 20.9 to determine if it is "irrational, illogical, or wholly unjustifiable." *Id.* (quoting Iowa Code § 17A.19(10)(*l*)–(*m*) (2013)). We noted, "The question of whether interpretive discretion has clearly been vested in an agency is easily resolved when the agency's enabling statute

explicitly addresses the issue." *Id.* (quoting *Renda v. Iowa Civil Rights Comm'n*, 784 N.W.2d 8, 11 (Iowa 2010)).

However, the 2017 amendments to section 20.6 removed the 2010 language; now, as before, PERB only "[a]dminister[s] the provisions of [Iowa Code chapter 20]." *See* 2017 Iowa Acts ch. 2, § 2 (codified at Iowa Code § 20.6(1) (2018)). The enabling statute no longer expressly vests interpretive discretion in PERB. *See* Iowa Code § 17A.19(10)(*c*), (*l*) (2018); *id.* § 20.6(1); *Waterloo Educ. Ass'n*, 740 N.W.2d at 420. We assume this change was deliberate, and accordingly our review is for correction of errors at law. *Waterloo Educ. Ass'n*, 740 N.W.2d at 420. Indeed, all parties to this appeal concede that is the appropriate standard.

**IV. Analysis.**

**A. Mandatory vs. Permissive Subjects of Bargaining.** Chapter 20, like labor law generally, recognizes two classes of collective bargaining proposals—mandatory and permissive. *See* Iowa Code § 20.9; *Waterloo Educ. Ass'n*, 740 N.W.2d at 421. "Mandatory subjects are those matters upon which the public employer is required to engage in bargaining." *Waterloo Educ. Ass'n*, 740 N.W.2d at 421. "Permissive subjects are those that the legislature did not specifically list in section 20.9, but are matters upon which both the public employer and the employee organization simply agree to bargain." *Id.* Topics can also be excluded from bargaining and reserved to management. *See* Iowa Code §§ 20.7, .9(3); *see also Waterloo Educ. Ass'n*, 740 N.W.2d at 431.

In *Waterloo Education Association*, we explained that the list of mandatory bargaining subjects in section 20.9 is exclusive. 740 N.W.2d at 425. "[I]f a proposal does not fall within one of the laundry list of terms contained in section 20.9, it is not a subject of mandatory bargaining." *Id.*

"In other words, this court has held that the legislature's laundry list in section 20.9 is exclusive and not merely descriptive or suggestive." *Id.*

"The classification of a bargaining proposal as either mandatory or permissive 'is a critical issue' " because statutory impasse procedures that lead to binding arbitration are available only when parties are unable to agree on a mandatory subject of bargaining. *AFSCME Iowa Council 61*, 846 N.W.2d at 879 (quoting *Waterloo Educ. Ass'n*, 740 N.W.2d at 421). When a bargaining subject is merely permissive, the employer reserves "the right to decide the issue unilaterally by declining to participate in bargaining," and chapter 20 impasse procedures are not available. *Id.* (quoting *Waterloo Educ. Ass'n*, 740 N.W.2d at 422).

To determine whether a proposal involves a mandatory subject of collective bargaining, we begin with "a determination of whether a proposal fits within the scope of a specific term or terms listed by the legislature in section 20.9." *Waterloo Educ. Ass'n*, 740 N.W.2d at 429. "Once that threshold test has been met, the next inquiry is whether the proposal is preempted or inconsistent with any provision of law." *Id.* "Only in unusual cases where the predominant topic of a proposal cannot be determined should a balancing-type analysis be employed to resolve the negotiability issue." *Id.* Under this framework, PERB seeks to identify a proposal's "predominant purpose." *AFSCME Iowa Council 61*, 846 N.W.2d at 880 (quoting *Waterloo Educ. Ass'n*, 740 N.W.2d at 427, 429). As we explained in *AFSCME Iowa Council 61*,

> In a typical case in which PERB is able to identify the predominant subject of a proposal, it next asks if that subject is "definitionally within the scope" of a topic listed in Iowa Code section 20.9. If the answer to that question is "yes," the proposal is a mandatory subject of collective bargaining— subject only to the limitation that proposals are not subject to collective bargaining if they are "preempted or inconsistent with any provision of law."

*Id.* (quoting *Waterloo Educ. Ass'n*, 740 N.W.2d at 425, 429).

**B. Definition of "Base Wages."** UE's Proposals I, III, and IV center on the same question: what does the term "base wages" as used in the 2017 amendments mean? Again, House File 291 amended chapter 20 so that for bargaining units with less than thirty percent public safety employees, base wages became the only mandatory subject of bargaining. 2017 Iowa Acts ch. 2, § 6 (codified at Iowa Code § 20.9(1)). Both PERB and the district court found that base wages were "the minimum (bottom) pay for a job classification, category or title, exclusive of additional pay such as bonuses, premium pay, merit pay, performance pay or longevity pay." UE argues this definition makes the term "virtually meaningless" because only a new hire would receive that level of pay.[3] Both UE and amicus curiae—the Iowa State Education Association—counter that base wages should be defined to include longevity pay and shift differentials and exclude only bonuses and overtime.

Our first task in interpreting a statute is to determine whether the relevant language is ambiguous. *See Iowa Ins. Inst. v. Core Grp. of Iowa Ass'n for Justice*, 867 N.W.2d 58, 71–72 (Iowa 2015). "If the statutory language is plain and the meaning clear, we do not search for legislative intent beyond the express terms of the statute." *State v. Pub. Emp't Relations Bd.*, 744 N.W.2d 357, 360–61 (Iowa 2008) (quoting *Horsman v. Wahl*, 551 N.W.2d 619, 620–21 (Iowa 1996)). Here, as an initial matter, we think reasonable minds could differ as to the meaning of base wages as used in the 2017 amendments. *See Iowa Ins. Inst.*, 867 N.W.2d at 73

---

[3]In Iowa, we often use the term "steps" to refer to compensation tiers within a given public employee job classification. An employee will receive additional steps to reflect time on the job, additional qualifications, etc. UE complains that under PERB's definition of base wages, only "step one" within each job classification is a mandatory subject of bargaining.

("A statute is ambiguous if reasonable minds could differ or be uncertain as to the meaning of the statute." (quoting *Mall Real Estate, LLC v. City of Hamburg,* 818 N.W.2d 190, 198 (2012))).  It is plausible that "base" could mean either (1) without *any* of the possible upward adjustments for workers in that job classification (PERB's position) or (2) without after-the-fact adjustments for additional work or quality of work (UE's position).  For example, *Webster's Third New International Dictionary* defines "base pay," "base salary," or "base wage" as "the minimum pay for a given rank or grade of a member of the armed forces."  *Base pay or base salary or base wage, Webster's Third New International Dictionary* (unabr. ed. 2002).  Yet the *Cambridge Dictionary* online equates the term "base wage" to "basic wage" and defines it as "the amount of money that someone earns, usually in an hour or in a week, not including any extra payments."[4]  The online investor resource Investopedia defines "base pay" more restrictively as "the initial rate of compensation an employee receives in exchange for services. It excludes extra lump sum compensation such as bonuses or overtime pay, as well as benefits and raises."[5]  *Black's Law Dictionary* references "base pay" as an example in defining the word "base": "Of, relating to, or involving a starting point; minimum <base pay>."  *Base, Black's Law Dictionary* (10th ed. 2014).

Accordingly, since the term is ambiguous, we now turn to our established methods of statutory interpretation.  *See Iowa Ins. Inst.*, 867 N.W.2d at 73.

---

[4]*Basic Wage, Cambridge Dictionary*, http://dictionary.cambridge.org /dictionary/english/basic-wage [http://perma.cc/K44W-X2ZG].

[5]Investopedia, http://www.investopedia.com/terms/b/base-pay.asp [http://perma.cc/6AE8-EYQP].

One guidepost is in the 2017 amendments themselves.  *See* 2017 Iowa Acts ch. 2.  Section 6 provides, "Mandatory subjects of negotiation specified in this subsection shall be interpreted narrowly and restrictively." *Id.* § 6 (codified at Iowa Code § 20.9(1)).  When the legislature issues this kind of directive on statutory interpretation, it binds us.  *See In re C.F.-H.*, 889 N.W.2d 201, 203 (Iowa 2016) (noting that we are "required [by Iowa Code section 232.1] to construe provisions in Iowa Code chapter 232 liberally"); *DeStefano v. Apts. Downtown, Inc.*, 879 N.W.2d 155, 179 (Iowa 2016) (noting that thanks to Iowa Code section 562A.2(1), the Iowa Uniform Residential Landlord and Tenant Act is to be "liberally construed and applied" to promote its purposes); *Sanford v. Fillenwarth*, 863 N.W.2d 286, 290 (Iowa 2015) (noting that under Iowa Code section 123.1, the Iowa Alcoholic Beverage Control Act is to be "liberally construed" to protect the "welfare, health, peace, morals, and safety of the people of the state").

Another interpretive tool is the legislative history.  *See* Iowa Code § 4.6(3); *Abbas v. Iowa Ins. Div.*, 893 N.W.2d 879, 890, 891 (Iowa 2017). The original version of the legislation, House Study Bill 84, resembled the final version in providing that units without a certain minimum percentage of public safety employees could bargain only on "base wages and other matters mutually agreed upon."  H. Study B. 84, 87th G.A., Reg. Sess. (Iowa 2017).  It also expressly excluded from bargaining

> insurance, leaves of absence for political activities, supplemental pay, transfer procedures, evaluation procedures, procedures for staff reduction, release time, subcontracting public services, grievance procedures for resolving any questions arising under the agreement, and seniority *and any wage increase*, employment benefit, or other employment advantage *based on seniority*.

*Id.* (emphasis added).  Hence, under the bill as first introduced, public employers would have been *prohibited* from bargaining with public

employees over seniority and wage increases based on seniority; these were not merely permissive subjects of bargaining. *Id.* Thus, at that point, base wages could not have included seniority-based wages, because it was forbidden to negotiate over seniority-based wages. *Id.*

On February 16, an amendment passed the House unanimously. *See* Amendment H–1101 to Amendment H–1096 to H.F. 291, 87th G.A., Reg. Sess. (Iowa 2017). The amendment did not affect the existing language limiting mandatory bargaining to base wages. *See id.* However, it trimmed a number of items including seniority and seniority-based wages from the list of excluded subjects of bargaining. *See id.* As a result, in the final version of the legislation, only the following items could *not* be the bargained over if the unit contained less than thirty percent public safety employees: "insurance, leaves of absence for political activities, supplemental pay, transfer procedures, evaluation procedures, procedures for staff reduction, and subcontracting public services." 2017 Iowa Acts ch. 2, § 6 (codified at Iowa Code § 20.9(3)). From this legislative history, including the fact that base wages remained unchanged throughout, it is logical to conclude that the term never included seniority-based wages and that this item had simply been shifted from a prohibited to a permissive subject of bargaining.

Another aid to interpretation are "[t]he circumstances under which the statute was enacted." *See* Iowa Code § 4.6(2); *State v. Davis*, 922 N.W.2d 326, 333 (Iowa 2019). Iowa's amendments to its public employee collective bargaining law followed, and share some similarities with, 2011 amendments to Wisconsin's public employment collective bargaining law. *See* 2011 Wis. Act 10, § 314 (codified at Wis. Stat. Ann. § 111.91(3)(a) (West, Westlaw current through 2017 Act 370)). The Wisconsin law also uses the term "base wages," as follows:

(3) The employer is prohibited from bargaining with a collective bargaining unit containing a general employee with respect to any of the following:

(a) Any factor or condition of employment except wages, which includes only total base wages and excludes any other compensation, which includes, but is not limited to, overtime, premium pay, merit pay, performance pay, supplemental compensation, pay schedules, and automatic pay progressions.

Wis. Stat. Ann. § 111.91(3)(a). Notably, under the Wisconsin statute, "pay schedules" and "automatic pay progressions" are not part of base wages. *Id.*

There is a presumption that "[an] entire statute is intended to be effective." Iowa Code § 4.4(2); *Iowa Ins. Inst.*, 867 N.W.2d at 75. Under prior law, for all covered public employees, "wages"—not just "base wages"—were a mandatory subject of bargaining. *See* Iowa Code § 20.9 (2017). But so were "shift differentials, overtime compensation, [and] supplemental pay." *Id.* The 2017 amendments removed the latter three topics from the mandatory bargaining list for bargaining units containing less than thirty percent public safety employees. 2017 Iowa Acts. ch. 2, § 6 (codified at Iowa Code § 20.9 (2018)). They added supplemental pay to the list of excluded subjects. *Id.* In addition, they narrowed "wages" to read "base wages." *Id.*

If we accepted UE and ISEA's interpretation of base wages, it would be difficult to see what these textual changes accomplished. It seems clear that mandatory bargaining no longer covers overtime compensation and shift differentials, because the 2017 amendments removed those items from the mandatory bargaining list. *Id.* Yet, it would be logical to conclude that base wages means something other than "wages exclusive of overtime compensation and shift differentials," because there would then be no need to add the word "base" once overtime compensation and shift

differentials had been removed.  *Compare* Iowa Code § 20.9(1) (2017), *with id.* § 20.9(1) (2018).

For all these reasons, we think PERB correctly focused on the added word—"base."  As PERB explained in a prior PERB ruling that it cited and relied upon in its declaratory order,

> Webster's definitions of "base" include "the bottom of something considered as its support: FOUNDATION," "the fundamental part of something: GROUNDWORK, BASIS" and "the starting point or line for an action or undertaking." *Merriam-Webster's Collegiate Dictionary* (10th ed. 1994).  *See also* https://www.merriam-webster.com/dictionary/base.  In the American Heritage Dictionary of the English Language, the definitions of "base" include "the lowest or bottom part: *the base of a cliff, the base of a lamp"* and "situated at or near the base or bottom: *a base camp for the mountain climbers."* https://ahdictionary.com/word/search.html?q=base.  Similarly, the Dictionary.com definition includes "the bottom support of anything; that on which a thing stands or rests: *a metal base for the table,"* and "the bottom layer or coating, as of makeup or paint."  www.dictionary.com/browse/base?s=t.

> The common and ordinary meaning of "base" thus reflects the idea that it is the bottom of something.  When used in conjunction with "wages" as a term of art, it is logically interpreted as meaning the bottom, lowest or minimum wage for an employee or employees in a given job classification.

*In re Columbus Cmty. Sch. Dist.*, 17 PERB 100820, 2017 WL 2212060, at *3 (May 17, 2017).

UE and ISEA argue that interpreting base wages to mean the minimum pay level for a given job classification renders public-employee collective bargaining rights meaningless.  We are not persuaded.  The public employer must still bargain with the employee organization over the minimum salary or wage that each job pays.  Iowa Code § 20.9(1)(2018).  For example, the 2015–2017 COGS collective bargaining agreement, negotiated by UE before the 2017 amendments took effect, established

minimum salaries for all bargaining unit employees for each contract year.[6] That negotiation would still be required. *See* Iowa Code § 20.9(1).

In addition, this argument disregards the fact that longevity pay, shift differentials, and overtime compensation are still *permissive* subjects of bargaining. *See* Iowa Code § 20.9(1), (3). This leaves it up to the state or local governmental unit whether to negotiate on these matters. *See* *Waterloo Educ. Ass'n*, 740 N.W.2d at 421. Public employees, like all citizens in our state, have the ability to affect those decisions. A branch of state government, a municipality, or a school board that wishes to negotiate on permissive subjects of bargaining with the employee organization is free to do so.

UE also argues that it is meaningless to negotiate base wages without knowing *how much* one will have to work—for example, without knowing what paid holidays and vacation bargaining unit employees will receive. But PERB acknowledged and accounted for this concern in the declaratory order. Thus, it stated in the declaratory order that as a part of its duty to bargain in good faith, the public employer must disclose its position on quantity-of-work items if it does not intend to bargain over them. Specifically,

> the employer has the good faith duty to indicate whether it will exercise its discretion over these quantity-of-work-related permissive topics in the manner contemplated by the employee organization's proposal or not. If not, the employer's obligation to bargain in good faith requires that it inform the organization whether those conditions of employment will exist at all for the term of the agreement being negotiated, and if so, the quantity or extent of those the employer will provide in its discretion. Only when it knows "the content of an honest day's work" will the employee organization be in a position to knowledgeably and rationally bargain employee base wages.

---

[6] *2015–2017 Contract*, UE Local 896 – COGS: Campaign to Organize Graduate Students (Mar. 15, 2015), https://cogs.org/current-contract [https://perma.cc/H8HS-7L6E].

UE also argues that PERB's interpretation leads to a situation where it cannot "represent all public employees [in the bargaining unit] fairly." Iowa Code § 20.17(1). But a breach of this duty occurs only when the employee organization engages in action or inaction that is "arbitrary, discriminatory, or in bad faith." *Id.* If only the floor level of compensation within each job classification is a mandatory subject of bargaining, and the public employer declines to negotiate experience pay above that floor, then the organization cannot be acting arbitrarily, discriminatorily, or in bad faith for failing to do what the collective bargaining law does not allow it to do. By the same token, even when the law *does* permit negotiation over longevity pay, the organization has considerable leeway to negotiate differences in pay among employees in the bargaining unit without running afoul of the duty of fair representation, even though some employees in the bargaining unit might think those differences are too wide or too narrow. *See Air Line Pilots Ass'n, Int'l v. O'Neill*, 499 U.S. 65, 74–78, 111 S. Ct. 1127, 1134–36 (1991); *Ford Motor Co. v. Huffman*, 345 U.S. 330, 338–39, 73 S. Ct. 681, 686 (1953).

**C. Definition of "Past Collective Bargaining Agreements."**

UE also argues that PERB erred in answering Proposal V regarding the meaning of the term "past collective bargaining agreements." PERB and the district court found that this phrase was a reference to agreements that predated the current expiring collective bargaining agreement. UE insists the mandate not to consider past collective bargaining agreements in the 2017 amendments also prohibits the arbitrator from considering the previously negotiated and now expiring collective bargaining agreement.

As an initial matter, we find that this term, like base wages, is ambiguous. *See People v. Adair*, 550 N.W.2d 505, 509 (Mich. 1996) (finding that the term "past sexual conduct" as used in the Michigan rape

shield law was ambiguous because there were two possible frames of reference by which "past" could be measured).

Yet as PERB noted, under UE's proposed interpretation of past collective bargaining agreements, the statute would be at war with itself. Since the 2017 amendments went into effect, section 20.22 has prohibited the arbitrator's consideration of past collective bargaining agreements for bargaining units containing less than thirty percent public safety employees, but it simultaneously limits the arbitrator's award in such cases to a percentage annual increase in base wages. *Compare* Iowa Code § 20.22(8)(*b*)(1), *with id.* § 20.22(10)(*b*). There is no way the arbitrator can carry out the latter directive while following UE's view of the former directive. Additionally, the 2017 amendments to section 20.22 require the arbitrator to compare the "base wages, hours, and conditions of employment of the involved public employees with those of other public employees doing comparable work." *Id.* § 20.22(8)(*a*)(1). There is no way the arbitrator can make this comparison without examining wage levels under the existing collective bargaining agreement.

We try to harmonize statutes so they can be obeyed and do not contradict themselves. *See* Iowa Code § 4.4(4) ("A result feasible of execution is intended."); *see also id.* §§ 4.7, .8, .11; *In re Estate of Sampson*, 838 N.W.2d 663, 671 (Iowa 2013) ("[W]e should read a statute as a whole and attempt to harmonize all its provisions."). Accordingly, we agree with PERB and the district court that "past collective bargaining agreements" do not include the current expiring agreement.

**V. Conclusion.**

For the reasons stated, we affirm the district court judgment upholding PERB's declaratory order and denying UE's petition for judicial review.

**AFFIRMED.**

All justices concur except Appel and Wiggins, JJ., who concur in part and dissent in part.

#18–0505, *United Elec., Radio & Mach. Workers of Am. v. IPERB*

**APPEL, Justice (concurring in part and dissenting in part).**

**I. Introduction.**

In 2017, the legislature changed the mandatory subjects of bargaining for public unions with less than thirty percent public safety employees. 2017 Iowa Acts ch. 2, § 6 (codified at Iowa Code § 20.9(1) (2018)). Henceforth, a public employer was required to bargain over only "base wages" with unions composed of less than thirty percent public safety employees. *Id.* By contrast, the legislation did not change a public employer's obligation to bargain over "wages, . . . shift differentials, overtime compensation, supplemental pay, seniority," and other matters with unions composed of at least thirty percent public safety employees. *Id.*

The first task before us in this case is to determine what the legislature intended by limiting the mandatory subject of bargaining for some unions to base wages. The term "base wages" is not defined in the Iowa Code. The appellant argues that any interpretation of the term must allow a union to negotiate wages for each individual. Appellees disagree, contending that the term only requires bargaining over the compensation paid to new employees at the beginning step of job classifications unilaterally determined by the employer.

The second task is to determine whether a rate of pay or time dimension falls within the scope of the term "base wage." In other words, does the right to bargain over base wages include the number of hours worked for a given dollar amount, or wage rate? Or does base wages only mean a dollar amount without any temporal dimension?

## II. Limiting Term "Base Wage" to Entry Level Positions.

**A. The Term "Base Wage" Is Ambiguous.** "A statute is ambiguous if reasonable minds could differ or be uncertain as to the meaning of the statute." *Sherwin-Williams Co. v. Iowa Dep't of Revenue*, 789 N.W.2d 417, 424 (Iowa 2010) (quoting *Carolan v. Hill*, 553 N.W.2d 882, 887 (Iowa 1996)). "Ambiguity may arise from specific language used in a statute or when the provision at issue is considered in the context of the entire statute or related statutes." *Id.* at 425 (quoting *Midwest Auto. III, LLC v. Iowa Dep't of Transp.*, 646 N.W.2d 417, 425 (Iowa 2002)).

A reasonable person could interpret base wages as the wage that an individual actually earns based on his seniority or step but exclusive of bonuses, overtime, benefits, and the like. For instance, one court required back pay of the base wage that an individual would have earned but for the inability to work due to sexual harassment. *Nichols v. Frank*, 771 F. Supp. 1075, 1079 (D. Or. 1991). Another court held that a company engaged in an unfair labor practice when it deviated from its policy of awarding annual, across-the-board wage increases to all employees because of their attempts to unionize. *NLRB v. Aluminum Casting & Eng'g Co.*, 230 F.3d 286, 293 (7th Cir. 2000). In a subsequent opinion, the court held that the increase must be incorporated into the "base wage of each worker." *United Elec., Radio & Mach. Workers of Am. v. NLRB*, 580 F.3d 560, 562, 566 (7th Cir. 2009).

The Code of Federal Regulations includes a reference to base wage that appears to imply its applicability to the wage each individual earns. According to the hazardous waste section of OSHA regulations, "Earnings include more than just your base wage; it includes overtime, shift differentials, incentives, and other compensation you would have earned if you had not been removed." 29 C.F.R. § 1910.1025 app'x B (2018).

In addition, the common usage of the term "base wage" would support an interpretation of base wage as applying to the wage that an individual actually earns. If asked about her base wage, I think, a common Iowan (or any American) would bring to mind the wage she is paid exclusive of bonuses and overtime, not the wage she would be paid if she was starting anew in her position. A textbook on wages and salaries seems to support that position. Lloyd L. Byars & Leslie W. Rue, *Human Resource Management* 277 (7th ed. 2004). The textbook states, "Usually compensation is composed of the *base wage or salary*, any incentives or bonuses, and any benefits. The base wage or salary is the hourly, weekly, or monthly pay employees receive for their work." *Id.* at 266. This definition applies base wages to each individual. *See id.*

At the same time, however, a reasonable person could consider base wages in the manner interpreted by PERB. A reasonable person, I think, could consider the legislature's use of the term "base wages" implies a term with a different meaning than the preexisting term "wages." And since the qualifier "base" could be considered a restricting qualifier, a reasonable person might reach the interpretation advanced by appellees.

There is caselaw supporting this approach to the term "base wages." A disputed contract in Minnesota defined "salary" as including base wages, selection premium, overtime, shift differentials, longevity payments, and other types of compensation. *City of Minneapolis v. Minneapolis Police Relief Ass'n*, 800 N.W.2d 165, 170 (Minn. Ct. App. 2011). Similarly, Bensalem, Pennsylvania, defines "average annual earnings" as "including base wage pay or salary, overtime pay, vacation pay, *longevity increment pay*, shift differential (if any), holiday pay, educational incremental pay, and any other direct monetary compensation." Bensalem, Pa., Code of

Ordinances § 24-71 (2018)[7] (emphasis added). The contract and municipal definitions imply that longevity payments are not automatically included in base wages.

The caselaw is highly contextual, and for me at least, is not very helpful. Nor do I find dictionary definitions helpful. The definitions themselves are ambiguous and present multiple options without providing appropriate context. Note, *Looking It Up: Dictionaries and Statutory Interpretation*, 107 Harv. L. Rev. 1437, 1449 (1994) ("One of the most significant flaws of dictionaries as interpretive tools is the imperfect relationship of dictionaries to statutory context."). As Judge Learned Hand explained, "[I]t is one of the surest indexes of a mature and developed jurisprudence not to make a fortress out of the dictionary." *Cabell v. Markham*, 148 F.2d 737, 739 (2d Cir. 1945).

**B. Resolving the Ambiguity.**

1. *Iowa legislative history.* There is a notable difference between the 2017 amendments to Iowa Code section 20.9 as first introduced and the legislation that ultimately became law. In addition to limiting the mandatory subject of bargaining to base wages for unions not composed of at least thirty percent public safety employees, the original legislation would have prevented bargaining on "seniority and any wage increase" as well as an "employment advantage based on seniority." H. Study B. 84, 87th G.A., Reg. Sess. (Iowa 2017). On the date the legislation passed the legislature, the latter exclusions were removed by a unanimous amendment. Amendment H-1101 to Amendment H-1096 to H.F. 291,

---

[7]https://library.municode.com/pa/bensalem/codes/code_of_ordinances?nodeld
=PTIADLE_CH24PE_ARTIIPEPL_DIV3EMPODE_S24-71DE    [https://perma.cc/3TPL-
C6YU].

87th G.A., Reg. Sess. (Iowa 2017).  The limitation to bargaining over base wages remained unchanged.  *See id.*

I find this legislative history only marginally helpful.  If the original legislation had become law, it would have been quite clear that step increases, for example, were not subject to collective bargaining.  But these specific provisions were amended out of the statute.  One might argue that the legislature did not want the prohibition and so deleted it.  On the other hand, one could argue that the prohibition was redundant and did not need to be included in the legislation in the first place.  Standing alone, I do not think either party can make a persuasive case out of this piece of legislative history.

2. *Comparison with Wisconsin statute.*  According to recently enacted Wisconsin law, a Wisconsin public employer is prohibited from negotiating, with certain unions, "pay schedules[] and automatic pay progressions" but may negotiate "total base wages."  Wis. Stat. Ann. § 111.91(3)(*a*) (West, Westlaw current through 2017 Act 370).  Thus, Wisconsin law expressly distinguishes between base wages and other matters bearing on the wages an individual is actually paid.  Assuming the Iowa legislature was aware of the Wisconsin precursor, one could argue that by not including the specific prohibition of pay schedules and automatic pay progressions as was included in the Wisconsin statute, the Iowa legislature intended a different result.  Or, again, perhaps the legislature deemed the specific prohibition unnecessary.  I think the failure to follow the Wisconsin model is interesting, and knowing the proclivities to follow beaten paths, points somewhat toward the union's interpretation of base wages.

3. *Legislative direction to narrowly interpret the statute.*  Thus, based solely on the terms of the statutory provision and the very limited

legislative history, I would likely lean slightly toward the union's position. But the Iowa legislature has directed that this statute should be narrowly interpreted. Iowa Code section 20.9(1) (2018) provides, "Mandatory subjects of negotiation . . . shall be interpreted narrowly and restrictively." This legislative directive materially changes the interpretive calculus.

The legislative direction in Iowa Code section 20.9 is the opposite of that contained in other statutes. For instance, the Iowa Civil Rights Act contains a provision stating that its terms should be "construed broadly" to effectuate the purposes of the law. Iowa Code § 216.18(1). Just as we follow the legislative direction to liberally interpret the Iowa Civil Rights Act, *e.g., Pippen v. State*, 854 N.W.2d 1, 28 (Iowa 2014), we must give the same bite to a legislative direction to narrowly construe the statute.

Plainly, when there are two plausible interpretations of an ambiguous mandatory subject of negotiations, the narrow construction should ordinarily prevail. But while legislative direction should be considered by courts in interpreting statutes, it is not a trump card that always prevails. *See, e.g., United States v. Anderson*, 626 F.2d 1358, 1369–70 (8th Cir. 1980) (refusing to follow statutory directive in RICO Act to liberally construe terms when doing so would not necessarily effectuate statutory purpose). For example, we cannot so narrowly construe a legislative term to undercut the purpose of the statute, nor can we narrowly construe statutes in a fashion that create conflicts with other statutory provisions. *See State v. Bedel*, 193 N.W.2d 121, 124 (Iowa 1971) (acknowledging statutory directive requiring liberal construction but noting that it cannot extend statutory language to cover cases in which statutory elements are lacking); *see also In re Anderson*, 824 F.2d 754, 759 (9th Cir. 1987) (acknowledging "California authorities which admonish that 'the homestead statutes are to be construed liberally on behalf of the

homesteader' " but stating that "liberal construction in favor of the debtor does not give us license to rewrite the California legislature's scheme for homestead protection." (quoting *Ingebretsen v. McNamer*, 187 Cal. Rptr. 529, 530 (Ct. App. 1982))); *Deason v. Fla. Dep't of Corr.*, 705 So. 2d 1374, 1375 (Fla. 1998) (explaining that strict construction of a statute should not emasculate the statute and defeat legislative intent).

In sum, although in my view the better reading might well be against the State, the legislative direction moves me in the other direction. The only remaining question is whether the narrow interpretation would defeat the underlying purposes of the statute or create a conflict with other statutory provisions.

4. *Conflict with legislative purpose or other statutory provisions.* There can be no dispute that restricting a union to only negotiating base wages will diminish unions' ability to achieve their goals and at least potentially undermine unions' ability to function. *See Laborers Local 236, AFL-CIO v. Walker*, 749 F.3d 628, 638–39 (7th Cir. 2014). Indeed, the changes in the 2017 amendments were plainly designed to, and have the effect of, restricting collective bargaining rights. Certainly an interpretation of the term "base wages" that is limited to the wages of a new employee in a given job classification is consistent with the general purpose of the 2017 amendments.

But we must also consider the broader picture. Although the mandatory terms of collective bargaining are to be construed narrowly and restrictively, we still, I take it, should construe the provisions of the statute "to promote harmonious and cooperative relationships between government and its employees by permitting public employees to organize and bargain collectively." Iowa Code § 20.1(1). This general declaration of statutory purpose has not been repealed and is, like Iowa Code section

20.9, designed to guide courts in interpretation of the statute. If we interpret the 2017 amendments to permit some unions to bargain for the wage paid to a new entrant in a given job classification without regard to other employees with more seniority, are those more senior public employees denied representation?

Other provisions of chapter 20 similarly raise the question of whether interpreting section 20.9(1) to only allow negotiations for the wages paid to some employees but not others is consistent with the statute. For instance, an employee organization is "an organization of any kind in which public employees participate and which exists for the primary purpose of representing employees in their employment relations." *Id.* § 20.3(4).

Similarly, an employee organization is "the exclusive representative of *all public employees* in the bargaining unit and shall represent *all public employees* fairly." *Id.* § 20.17(1) (emphasis added). The term "all" is used twice. Can a union represent all employees fairly if it can only negotiate wages for some of them?

Further, "[p]ublic employees shall have the right to . . . . [n]egotiate collectively through representatives of their own choosing." *Id.* § 20.8(2). Is a public employee's right to negotiate collectively nullified by an interpretation that allows negotiation only for the wages paid to others?

We cannot ignore these larger statutory considerations. Still, by negotiating base rates, the union can establish what amounts to a floor within a job classification. Negotiating a raise in the entry level salary might bump up the employer's compensation offered to more experienced employees. But, yet, it might not. Such an increase would be in the sole discretion of the employer. The more experienced employees have no right

to have a collective bargaining representative bargain for them directly with the employer for a contractually based increase in wages.

I conclude that the interpretation that limits base wages to entry level positions in each job classification cannot be squared with the larger legislative purposes of the statute. Under the statute, the union is to represent all employees, not just some. The construction of the statute that eliminates the ability of the union to negotiate wages for all employees cuts too deeply into the purposes of the collective bargaining framework. I would conclude that for the purposes of the statute, all employees have a base wage and that the term "base wage" may be narrowly construed to include only the lowest pay necessarily available to that individual, absent bonuses, incentives, or supplemental pay of any kind.

### III. Wages as Including Rate.

The second issue in this case is whether the term "base wage" also includes a concept of rate. In other words, under the statute as amended, can a public employer refuse to negotiate on the amount of services that must be rendered for a given economic reward?

In my opinion, by providing that base wages is a mandatory subject of collective bargaining, the legislature intended to allow bargaining over both the economic reward and the level or amount of services to be rendered for that reward. This is consistent with our precedent and the legislature's use of the word "wages" in other contexts.

In *Waterloo*, we held that the term "wages" encompasses an economic reward based upon services rendered. *Waterloo Educ. Ass'n v. Iowa Pub. Emp't Relations Bd.*, 740 N.W.2d 418, 430 (Iowa 2007). Quoting a state public employee relations board, we explained, "It is only possible to rationally bargain for 'an honest day's pay' if one can also negotiate the boundaries and the contents of 'an honest day's work.' " *Id.* (quoting *Or.*

*Pub. Emps. Union, Local 503 v. State*, 10 PECBR 51 (July 1987)). We further observed, "The employee's economic interest in more pay for more work is precisely the kind of employee interest that leading commentators for decades have suggested should be subject to collective bargaining." *Id.* (collecting authorities). Finally, we noted that the proposal would not limit management's discretion to assign work, but relates solely to payment for an amount of services rendered. *Id.*

In interpreting the term in *Waterloo,* we said that the legislature intended a "relatively narrow construction," but not the "narrowest possible interpretation," of the term. *Id.* at 429–30. Consequently, we gave the term its "common and ordinary meaning." *Id.* at 430.

In 2017, in addition to requiring that some unions are only able to bargain over base wages, the legislature stated that the mandatory subjects of bargaining applicable to all types of unions "shall be interpreted narrowly and restrictively." Iowa Code § 20.9(1). Since the legislature's directive may require a different interpretive approach than we took in *Waterloo,* there arises a question as to whether our decision in *Waterloo* remains good law.

I do not believe the legislature intended a different result on this issue than that reached in *Waterloo.* Most importantly, the legislature continued to use the word "wages." That was the term considered in *Waterloo.* Further, in other parts of the Iowa Code, the legislature indicates that the term "wages" is a reflection of an economic reward for services rendered. One example is the Iowa Wage Payment Collection Law. The term "wages," for purposes of that law, means "compensation owed by an employer for [l]abor or services rendered by an employee, whether determined on a time, task, piece, commission, or other basis of calculation." Iowa Code § 91A.2(7)(*a*).

It is true that under the legislative changes, "hours" is no longer a mandatory subject of bargaining for disfavored unions. But to me, the term "hours" means the times employees are required to report to work and remain there.

Finally, I do not agree with the majority that requiring an employer to inform the union of expected services to be rendered as an element of good faith bargaining resolves this issue. First, if the number of hours is not part of contractually bargained for wages, the employer may simply change them unilaterally. For example, a union might negotiate an increase in pay for entry level teachers of two percent, but in response, the employer might unilaterally increase the number of classes to be taught by twenty-five percent or even fifty percent. The argument, as I understand it, is that a person who receives a fifty percent increase in time on the job for the same pay gets the same wages. I doubt that many workers would agree with that proposition.

Second, if an employer does not inform the union of the amount of work expected for a certain wage, the union has no timely remedy. An unfair labor practice proceeding will not likely resolve the issue in time to meet the bargaining deadlines required by Iowa Code § 20.17(3) and (9).

For the above reasons, I conclude that the term "wages" includes within it the amount of work expected to be performed for the compensation offered.

**IV. Conclusion.**

I would reverse and remand the district court judgment. I respectfully dissent.

Wiggins, J., joins this concurrence in part and dissent in part.